# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., <br><br>  Plaintiffs, <br><br> v. <br><br> UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, <br><br> and <br><br> LISA JACKSON, Administrator of the Environmental Protection Agency, <br><br>  Defendants. | Civil Action 10-00985 (HHK) |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Center for Biological Diversity, Center for Food Safety, Friends of the Earth, International Center for Technology Assessment, and Oceana (collectively, "plaintiffs") bring this action against the U.S. Environmental Protection Agency and its Administrator, Lisa Jackson (collectively, "EPA"), seeking to compel agency action with regard to the regulation of emissions by non-road vehicles and engines, including marine vessels and aircraft, under the Clean Air Act ("the Act"), 42 U.S.C. § 7401 *et seq*. Before the Court are two joint motions to intervene in support of EPA, the first [#10] on behalf of the Air Transport Association of America ("ATA") and the National Business Aviation Association ("NBAA") and the second [#12] on behalf of the Aerospace Industries Association of America ("AIA") and the General Aviation Manufacturers Association ("GAMA"). Because these motions raise nearly identical issues, the Court addresses them together, referring to all of the putative intervenors collectively as "movants." Upon

consideration of the motions, the oppositions thereto, and the record of this case, the Court concludes that both motions should be denied.

## I.  BACKGROUND

**A.     The Clean Air Act and Aircraft Emissions Regulations**

The Clean Air Act gives EPA the authority to regulate "air pollutants," a category that it defines very broadly. *See* 42 U.S.C. § 7402(g); *Massachusetts v. EPA*, 549 U.S. 497, 506–10 (2007) (describing the history of the Act and efforts to address climate change). The Act also creates a specific regulatory scheme for emissions from "nonroad" engines and vehicles (other than train locomotives), including aircraft. *See* 42 U.S.C. § 7547(a). Under that framework, EPA "shall" conduct a study of emissions from such sources, *id*. § 7547(a)(1), and determine whether they are "significant contributors to ozone or carbon monoxide concentrations in more than 1 area which has failed to attain the national ambient air quality standards for ozone or carbon monoxide." *Id.* § 7547(a)(2). If that determination is affirmative, EPA must promulgate appropriate regulations. *Id.* § 7547(a)(3).

EPA may also promulgate regulations if it determines that any other emissions from such sources "significantly contribute to air pollution which may reasonably be anticipated to endanger public health or welfare." *Id.* § 7547(a)(4). Similarly, the Act states that EPA "shall, from time to time, issue proposed emission standards applicable to the emission of any air pollutant from any class or classes of aircraft engines which in [its] judgment causes, or contributes to, air pollution which may reasonably be anticipated to endanger public health or

2

welfare." *Id.* § 7571(a)(2)(A). These predicate determinations are commonly referred to as "endangerment findings."

Pursuant to its authority under the Act, EPA has adopted aircraft emission standards "covering certain criteria pollutants or their precursors and smoke; these standards do not currently regulate emissions of $CO_2$ and other [greenhouse gases]." *Regulating Greenhouse Gas Emissions Under the Clean Air Act*, 73 Fed. Reg. 44,354, 44,469 (July 30, 2008). In setting emissions standards, EPA has historically cooperated with the Federal Aviation Administration and the International Civil Aviation Organization, *id.*, which is an agency of the United Nations charged with fostering the safe and orderly growth of international civil aviation.

**B.      Plaintiffs' Petitions**

Between October 2007 and January 2008, plaintiffs submitted three petitions to EPA, asking it to use its authority under the provisions described above to regulate greenhouse gas emissions from marine vessels, aircraft, and other nonroad vehicles. Compl. ¶¶ 48–50. EPA subsequently issued an Advance Notice of Proposed Rulemaking regarding greenhouse gas emissions, *see* 73 Fed. Reg. 44,354, but plaintiffs assert that it was not responsive to their petitions because it failed to determine whether greenhouse gas emissions from these sources endanger public health or welfare or to establish a plan for regulating such emissions. Compl. ¶¶ 55–59. Accordingly, plaintiffs filed a notice of intent to sue as required by the Act, Compl. ¶ 53; *see* 42 U.S.C. § 7604(a), (b)(1), and commenced this action, seeking to compel EPA to respond to their petitions. Shortly thereafter, movants, who represent numerous manufacturers

3

and operators of aircraft, aircraft components, and aircraft engines,[1] sought leave to intervene in support of EPA. *See* AIA & GAMA's Mem. in Supp. of Mot. for Leave to Intervene ("AIA & GAMA Mem."); ATA & NBAA's Mem. in Supp. of Mot. for Leave to Intervene ("ATA & NBAA Mem."). EPA takes no position on movants' intervention; plaintiffs oppose it.

## II. ANALYSIS

Movants seek leave to intervene in this action on two grounds: they assert that they are entitled to intervene as of right under Federal Rule of Civil Procedure 24(a); they alternatively seek permissive intervention under Rule 24(b). Plaintiffs respond that movants do not meet either intervention standard, and further assert that movants may not intervene here because they lack standing to do so. The Court first addresses intervention as of right.

### A. Intervention as of Right Under Rule 24(a)

Movants assert that they are entitled to intervene as of right in this action because they have made the necessary showing under Rule 24(a).[2] Plaintiffs disagree, and further challenge movants' Article III standing to intervene. Movants respond that they do not need to establish

---

[1] AIA represents aerospace and defense manufacturers; GAMA represents aircraft and aircraft component manufacturers; ATA represents air passenger and cargo carriers; and NBAA represents companies of various types that own and operate general aviation aircraft.

[2] Intervention as of right under Rule 24(a) turns on four factors: (1) the timeliness of the motion; (2) whether the applicant claims an interest relating to the property or transaction which is the subject of the action; (3) whether the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest; and (4) whether the applicant's interest is adequately represented by existing parties. *See* FED. R. CIV. P. 24(a)(2); *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 731 (D.C. Cir. 2003).

standing in order to intervene as of right. Because standing goes to the Court's jurisdiction, *see Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002), the Court turns first to that issue.

### 1. Putative Intervenors as of Right Must Establish Article III Standing in this Circuit

Movants argue that the standing inquiry is redundant where a party seeks to intervene as of right "because an intervenor who satisfies Rule 24(a) will also have Article III standing." ATA & NBAA's Reply to Pl.'s Opp'n ("ATA & NBAA Reply") at 2; *accord* AIA & GAMA Mem. at 10 n.8. They would thus have the Court set aside the standing inquiry and focus solely on the Rule 24(a)(2) intervention as-of-right factors. Movants base this argument on the D.C. Circuit's opinion in *Roeder v. Islamic Republic of Iran*, 333 F.3d 228 (D.C. Cir. 2003), which acknowledged a split among the circuits as to whether prospective intervenors must establish standing and discussed certain difficulties that can arise when applying the standing inquiry to such cases. *Id*. at 233–34. In so doing, the *Roeder* court suggested that "[w]ith respect to intervention as of right in the district court, the matter of standing may be purely academic." *Id*. at 233; *see also Akiachak Native Cmty. v. U.S. Dep't of Interior*, 584 F. Supp. 2d 1, 7 (D.D.C. 2008) (citing *Roeder* for the proposition that a Rule 24 intervenor will always have Article III standing). Movants, however, attribute too much significance to this language. *Roeder* did not depart from the D.C. Circuit's clearly established rule that "an intervenor must also establish its standing under Article III of the Constitution." *Roeder*, 333 F.3d at 233 (citing *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 731–32 (D.C. Cir. 2003); *Bldg. & Constr. Trades Dep't v. Reich*, 40 F.3d 1275, 1282 (D.C. Cir. 1994)).

First, the *Roeder* court itself engaged in a standing inquiry, albeit a very brief one. *See id.* at 233–34. Second, as a three-judge panel, the *Roeder* court had no authority to abrogate the clear rule announced in prior three-judge panel cases like *Fund for Animals* and *Building and Construction Trades*. *See LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (en banc). Third and finally, subsequent decisions of the D.C. Circuit and this district flatly state that putative intervenors must meet Article III's standing requirements. *See, e.g.*, *United States v. Phillip Morris USA, Inc.*, 566 F.3d 1095, 1146 (D.C. Cir. 2009); *City of Naples Airport Auth. v. FAA*, 2004 WL 1080160, at *1 (D.C. Cir. May 13, 2004); *Jones v. Prince George's Cnty., Md.*, 348 F.3d 1014, 1017 (D.C. Cir. 2003); *Wildearth Guardians v. Salazar*, 2010 WL 4923884, at *6 (D.D.C. Dec. 6, 2010); *In re Endangered Species Act Section 4 Deadline Litig.*, 2010 WL 3386392, at *3 (D.D.C. Aug. 27, 2010). Thus, the Court cannot eschew the standing inquiry here, and will determine whether movants have Article III standing to intervene.

2.  **Movants Cannot Establish Article III Standing**

In *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), the Supreme Court explained that "the irreducible constitutional minimum of standing" contains three elements: (1) injury-in-fact, (2) causation, and (3) redressability. *Id.* at 560–61. A would-be plaintiff or intervenor must show all three. *Id.* at 561. To establish the existence of an injury-in-fact, a party must show an invasion of a legally protected interest that is "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical.'" *Id.* at 560 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). Where the alleged injury has not yet occurred, the necessary level of imminence is "somewhat elastic," but requires that the injury be "'*certainly* impending.'" *Id.* at 564 n.2 (quoting *Whitmore*, 495 U.S. at 158 (emphasis added)). To establish causation, the party

must show that the injury complained of is "'fairly . . . trace[able] to the challenged action . . . and not . . . th[e] result [of] the independent action of some third party not before the court.'" *Id.* at 560 (alterations in original) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)). Finally, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561 (quoting *Simon*, 426 U.S. at 38, 43).

Here, then, movants must demonstrate a causal connection between a judgment by this Court for plaintiffs and a concrete and imminent injury-in-fact to themselves.[3] *See Fund for Animals*, 322 F.3d at 733. For the purpose of this analysis, the Court will assume that plaintiffs will prevail on the merits of this action and obtain the relief they seek: responses to their petitions, endangerment findings to be undertaken by EPA within 90 days, and the initiation of rulemakings (or explanations for a lack thereof) if the endangerment findings are affirmative. *Cf. id.* (analyzing the putative intervenor's standing with relation to the relief sought by the plaintiffs).

Movants identify two elements of the relief sought by plaintiffs that they believe will cause them injuries sufficiently concrete to confer standing here: the imposition of new aircraft emissions standards, and the development of such standards on an accelerated timetable.[4]

---

[3] The Court assumes that if movants can establish the first two elements of standing, the redressability prong will also be satisfied; after all, if movants show that a judgment by this Court *for* plaintiffs will directly cause the injury they identify, they will necessarily have shown that a judgment *against* plaintiffs would likewise redress that injury. *Cf. Fund for Animals*, 322 F.3d at 733 ("This injury [identified by the prospective intervenor] is fairly traceable to the regulatory action . . . that the [plaintiff] seeks [to compel]. And it is likely that a decision favorable to the [intervenor] would prevent that loss from occurring.").

[4] Presumably because of their misconception, described above, that standing need not be established in intervention-as-of-right cases, movants devote little attention to standing in their filings. Accordingly, in analyzing movants' standing arguments, the Court also draws on

7

Plaintiffs rejoin that the former is too hypothetical to confer standing and the latter will not result in any injury to movants. The Court addresses each in turn, finding neither to support movants' standing here.

### a. The Imposition of New Aircraft Emissions Regulations

Movants assert that aircraft emissions standards "have enormous consequences for commercial and business aircraft operators in terms of investment in aircraft, asset value of the existing fleet, maintenance support, and the conduct of operations." ATA & NBAA Mem. at 4; *see also* AIA & GAMA Mem. at 5–6. The Court does not doubt, and plaintiffs do not contest, the accuracy of this assertion. Further, this type of injury — economic harm resulting from government action that changes market conditions — is routinely recognized as sufficiently concrete to constitute an injury-in-fact for standing purposes. *See, e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 432–33 (1998). Plaintiffs argue, however, that the implementation and enforcement of new emissions standards — and thus, the economic consequences thereof — are too hypothetical and too far removed from a judgment of this Court to constitute a "certainly impending," causally connected injury for standing purposes. Plaintiffs are correct.

In order for a judgment of this Court in plaintiffs' favor to result in the economic harms identified by movants, several contingencies would have to come about: EPA would have to make endangerment findings; those findings would have to be positive; EPA would have to initiate a rulemaking; that rulemaking would have to result in emissions standards that forced

---

their arguments, directed at the Rule 24(a)(2) standard, that their interests would be impaired by a judgment for plaintiffs.

movants to spend money. The parties dispute the extent to which each of these steps must necessarily flow from the previous one, but the *only* event that is guaranteed to flow directly from a judgment of this Court is the first. The rest are all contingent upon an affirmative endangerment finding by EPA, an outcome that will turn not on any order of this Court but rather on the application of agency expertise to scientific evidence.[5] Thus, it cannot be said that if the Court finds for plaintiffs, the economic harm that movants predict will be "'*certainly* impending.'" *Lujan*, 504 U.S. at 564 n.2 (quoting *Whitmore*, 495 U.S. at 158 (emphasis added)). Rather, such an outcome would remain "hypothetical" at least until an affirmative endangerment finding was made. *Id.* at 560 (quoting *Whitmore*, 495 U.S. at 155) (internal quotation marks omitted). By the same token, the intervening contingency of the endangerment finding prevents the economic harm asserted by movants from being "fairly . . . trace[able]" to a judgment in favor of plaintiffs. *Id.* (quoting *Simon*, 426 U.S. at 41) (internal quotation marks omitted). This alleged injury thus fails both the injury-in-fact and causation prongs of the standing test.

None of the cases cited by movants alters this analysis. Each one involved a course of agency action that had advanced beyond the preliminary steps that plaintiffs seek to trigger here. For example, in *Fund for Animals*, 322 F.3d 728, the plaintiffs sought to reverse a prior determination by the Fish and Wildlife Service ("FWS") that a particular Mongolian sheep was not "endangered" under the Endangered Species Act. The D.C. Circuit held that the government of Mongolia had standing to intervene in support of FWS, finding that Mongolia had established

---

[5] *See, e.g.*, *EPA Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act*, 74 Fed. Reg. 18,886, 18,904 (Apr. 24, 2009) (explaining that an endangerment finding in the greenhouse gas context was based on "the product of decades of research by thousands of scientists from the U.S. and around the world").

9

an imminent injury-in-fact by showing that a listing of the animal as "endangered" would result in restrictions on the import of the animals into the United States and thus a drop in tourist income from American hunters in Mongolia. *See id.* at 733–34. The key difference between *Fund for Animals* and this case is that in *Fund for Animals*, the predicate determination in question had already been made (in the negative) and the plaintiffs were seeking to have the Court *reverse* it. The same was true in *County of San Miguel, Colorado v. MacDonald*, 244 F.R.D. 36, 44–45 (D.D.C. 2007) (allowing intervention by landowners where the plaintiffs sought to reverse a decision by FWS not to list as "endangered" an animal species that lived on the landowners' property).[6] Here, by contrast, plaintiffs only ask the Court to require EPA to *make* the determination, not to reach any particular result.[7]

A much closer analogue to this case can be found in *In re Endangered Species Act Section 4 Deadline Litigation*, 2010 WL 3386392, at *3 (D.D.C. Aug. 27, 2010) [hereinafter *In re ESA Litigation*]. There, the plaintiffs (some of whom are plaintiffs in this case) alleged that

---

[6] Likewise, the Court does not find *Military Toxics Project v. EPA*, 146 F.3d 948 (D.C. Cir. 1998), or *American Horse Protection Association, Inc. v. Veneman*, 200 F.R.D. 153 (D.D.C. 2001), to be analogous. In both of those cases, the plaintiffs were challenging the validity of regulations already in place, the abrogation of which would necessarily result in new rulemakings to replace them. Here, as described above, a ruling by this Court for plaintiffs cannot result in any rulemaking that would change the regulatory status quo unless followed by an affirmative endangerment finding by EPA. Finally, *Natural Resources Defense Council v. Costle*, 561 F.2d 904 (D.C. Cir. 1977), on which movants heavily rely, is inapposite: that case dealt only with intervention and made no mention of standing (and predated the D.C. Circuit's rule that would-be intervenors must show standing).

[7] Movants are surely right that plaintiffs seek to have EPA make the endangerment findings because they hope for an affirmative result, which would in turn trigger rulemaking. *See* ATA & NBAA Reply at 3–4. Even so, plaintiffs' hope that this suit will cause the eventual regulation of aircraft emissions does not make it so: the intervening contingency of the endangerment finding, rather than plaintiffs' aspirations, governs the imminence and causation inquiries here.

FWS had failed to determine, before a statutorily imposed deadline, whether a particular species of salamander was endangered, and sought "an order declaring that the FWS failed to comply with its statutorily-mandated deadline and . . . requiring the Secretary to make the required finding by a date certain." *Id*. at *2. A corporation called TRC, which owned land comprising a portion of the salamander's habitat, sought to intervene on behalf of FWS, arguing that "the outcome of the FWS listing determination for this species may precipitate restrictions on the use of its land and business operations." *Id*. at *3.

The *In re ESA Litigation* court concluded that the corporation had failed to establish Article III standing, stating:

> TRC's alleged injury is based entirely on the potential substantive outcome of the FWS's listing determination for the Tehachapi slender salamander, which is not before this Court. The case before this Court deals only with the FWS's alleged failure to complete a preliminary step in the listing process within the time period required by law. *Because this Court will issue no order directly impacting TRC's use of its property, TRC's claims of injury from restrictions on its property use and business operations bear no relation to the present action*.

*Id*. at *4 (emphasis added). The same is true here. Movants' alleged injury "is based entirely on the potential substantive outcome of [EPA's endangerment] determination . . . which is not before this Court." *Id*. Accordingly, that injury is neither certainly impending nor fairly traceable to any judgment of this Court in the present action. *See Lujan*, 504 U.S. at 560, 564 n.2; *In re ESA Litig.*, 2010 WL 3386392, at *4.

    **b.**  **The Accelerated Timetable Sought by Plaintiffs**

In an effort to narrow the causal gap between a judgment of this Court for plaintiffs and any concrete harm to themselves, movants next assert that they would be harmed by the accelerated timetable sought by plaintiffs, under which EPA would be required to issue

endangerment findings within 90 days of the Court's judgment. Movants fear that the resulting regulations could impose "significant costs which may or may not be practical, realistic, or justified." AIA & GAMA Mem. at 13. Plaintiffs respond that they do not in fact seek an accelerated timetable for the promulgation of regulations, only for the predicate endangerment findings. Thus, plaintiffs aver, any regulations that eventually result will have had the benefit of full deliberation by EPA and participation by movants. Plaintiffs have the stronger argument.

Movants appear to argue that they would be harmed both by a rushed rulemaking process and by an accelerated endangerment finding. The former, however, is not among the relief sought by plaintiffs. Rather, plaintiffs merely ask the Court to declare that *if* EPA makes an affirmative endangerment finding, it must "*initiate* rulemaking" pursuant to the Clean Air Act. Compl. at 29 (emphasis added). No timetable for the initiation or completion of such a rulemaking is requested.[8] Thus, there appears to be no basis for movants' fears that a judgment of this Court in favor of plaintiffs would result in regulations promulgated too quickly for them to have significant input. *Cf. In re ESA Litig.*, 2010 WL 3386392, at *4 (rejecting the prospective intervenor's argument that it would be harmed by the timing of the decision that the plaintiffs sought to compel FWS to make).

Plaintiffs do, however, seek an accelerated timetable for the predicate endangerment findings: they ask the Court to order EPA to conduct endangerment findings within 90 days of

---

[8] Indeed, the paragraphs in the prayer for relief that address section 213(a) of the Clean Air Act ask the Court to require that, after an affirmative endangerment finding, EPA either "initiate rulemaking . . . *or explain the reasons for its decision not to act*." Compl. at 29 (emphasis added). Thus, with regard to two of their three claims, plaintiffs do not seek any mandated rulemaking at all, let alone a rulemaking with an accelerated timetable like that described by movants.

the Court's judgment. Even so, movants fail to clarify why such an outcome would support standing here. They assert that 90 days is not a sufficient length of time for EPA to adequately consider the aviation industry's "many technical, legal, and practical complexities."[9] AIA & GAMA Mem. at 13. They do not explain, however, how such an outcome would actually *harm* them. If they mean to suggest that a shortened endangerment finding period would increase the likelihood of an *affirmative* finding, thus triggering unnecessary rulemaking, they do not explain how or why that is the case. Further, for such an argument to support standing, movants would need to show both that a 90-day timetable would constitute an omission of a statutorily required procedure and that it is "substantially probable" that such an omission would cause them an injury-in-fact. *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664–65 (D.C. Cir. 1996). They have not attempted to show the former at all, and have failed to establish the latter.[10] Accordingly, the timetable elements of the relief sought by plaintiffs cannot create standing for movants to intervene here.

### 3. Movants May Not Intervene as of Right Because They Lack Standing

---

[9] Movants do not explain why these policy issues are appropriate factors for EPA to consider in determining whether emissions of greenhouse gases from aircraft engines cause or significantly contribute to air pollution that may reasonably be anticipated to endanger public health or welfare in the meaning of the Clean Air Act. *See Massachusetts v. EPA*, 549 US 497, 533 (2007) (explaining that regulatory "policy judgments . . . have nothing to do with whether greenhouse gas emissions contribute to climate change" and holding that it was error for EPA to rely on such considerations in lieu of reaching an endangerment determination or explaining why it was unable to do so).

[10] The same requirement would be fatal to any argument that the shortened endangerment finding window *itself* caused an injury-in-fact to movants. *See Fla. Audubon Soc'y*, 94 F.3d at 664.

Because movants fail to identify an injury that is concrete, certainly impending, and fairly traceable to a judgment of the Court, they cannot establish standing and may not intervene as of right in this action. The Court will thus eschew any separate consideration of the Rule 24(a) factors, but it notes that much of the standing analysis above also applies to the question of whether movants have a protectable interest in the outcome of this action within the meaning of Rule 24(a)(2). *Cf. In re ESA Litig.*, 2010 WL 3386392, at *4 (finding that where intervenor-applicants lacked standing, they also lacked a legally protectable interest under Rule 24(a)(2), which requires "that the intervenor will either gain or lose by the direct legal operation and effect of the judgment" (quoting *United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1291–92 (D.C. Cir.1980)) (internal quotation marks omitted)).

**B.      Permissive Intervention Under Rule 24(b)**

In the alternative, movants seek permissive intervention under Rule 24(b). Under that provision, the Court may allow timely intervention[11] if the movant has a conditional statutory right to intervene or "a claim or defense that shares with the main action a common question of law or fact." FED. R. CIV. P. 24(b)(1)(A), (B). The D.C. Circuit has adopted a flexible reading of Rule 24(b)'s "claim or defense" language, "allowing intervention even in 'situations where the existence of any nominate claim or defense is difficult to find.'" *EEOC v. Nat'l Children's Ctr.*, 146 F.3d 1042, 1046 (D.C. Cir. 1998) (quoting *Nuesse v. Camp*, 385 F.2d 694, 704 (D.C. Cir. 1967)). Even where a party clears the claim-or-defense threshold, the Court has "considerable latitude" to grant or deny intervention based on the particular circumstances of the case. *Crow Tribe of Indians v. Norton*, 2006 WL 908048, at *2 (D.D.C. Apr. 7, 2006) (citing *Nat'l*

---

[11] Plaintiffs do not dispute that movants' motions to intervene were timely.

*Children's Ctr.*, 146 F.3d at 1046, 1048); *see also Stringfellow v. Concerned Neighbors in Action*, 80 U.S. 370, 382 n.1 (1987) ("[T]he decision whether to grant permissive intervention resides largely in the discretion of the district court.").

At the outset, the Court notes that there is substantial confusion as to whether the D.C. Circuit's reading of Rule 24(b) allows for permissive intervention where the would-be intervenor lacks Article III standing. *See In re Vitamins Antitrust Class Actions*, 215 F.3d 26, 31–32 (D.C. Cir. 2000) (noting that prior cases employ a very broad reading of Rule 24(b) but also require that permissive intervenors have an independent basis for subject-matter jurisdiction, resulting in "uncertainty over whether standing is necessary for permissive intervention" (citing *Nat'l Children's Ctr.*, 146 F.3d at 1045–46)); *accord. Rubin v. Islamic Republic of Iran*, 2010 WL 3501554, at *3 n.4 (D.D.C. Sept. 08, 2010). If Article III standing is required, then it is, for the reasons explained above, beyond the Court's power to allow movants to intervene here. The Court, however, need not determine whether that is the case, because it concludes that even if movants meet the "claim or defense" standard, they should not be allowed to intervene.

In exercising its discretion under Rule 24(b), the Court must consider "whether the intervention will unduly delay or prejudice the rights of the original parties," FED. R. CIV. P. 24(b)(3), and may also consider "whether parties seeking intervention will significantly contribute to . . . the just and equitable adjudication of the legal question presented." *Aristotle Int'l, Inc. v. NGP Software, Inc.*, 714 F. Supp. 2d 1, 18 (D.D.C. 2010) (quoting *H.L. Hayden Co. v. Siemens Med. Sys., Inc.*, 797 F.2d 85, 89 (2d Cir. 1986) (alteration in original)). It is on these grounds that the Court concludes that movants should not be allowed to intervene here.

Movants' concern over this case is obvious: if plaintiffs succeed in compelling EPA to undertake endangerment findings with regard to aircraft emissions, those findings might be positive. If so, EPA may promulgate regulations that could impose financial burdens on movants. What is less obvious is movants' potential contribution to the "'just and equitable adjudication of the legal question presented.'" *Aristotle*, 714 F. Supp. 2d at 18 (quoting *H.L. Hayden Co.*, 797 F.2d at 89). Movants argue persuasively that they have substantial expertise and a unique perspective regarding the manufacture and operation of aircraft and the engines thereof. Contrary to movants' assertions, however, aircraft and their engines are not at issue in this case. Rather, the Court has been asked to determine whether EPA has an enforceable obligation to make the findings sought by plaintiffs and, if so, whether it has breached that obligation. With regard to *these* questions, movants offer no more than conclusory assertions that their participation will be helpful, and fail to demonstrate an "'ability to contribute to the full development of the factual and legal issues presented.'" *City of Williams v. Dombeck*, 2000 WL 33675559, at *4 (D.D.C. Aug. 17, 2000) (quoting *Humane Soc'y v. Clark*, 109 F.R.D. 518, 521 (D.D.C. 1985)); *cf. Envtl. Def. Fund v. Thomas*, 1985 WL 6050, at *6–7 (D.D.C. Oct. 29, 1985) (denying permissive intervention where industry groups sought to intervene in a suit over the timing with which EPA would promulgate certain regulations, on the ground that their "substantial experience and technical expertise as an industry . . . ha[d] no bearing on the legality of the timetable process here in dispute").

Thus, even if movants' interest in this case is sufficiently concrete to constitute "a claim or defense" under Rule 24(b) — and if their lack of Article III standing does not otherwise preclude permissive intervention — "intervening in this essentially procedural matter is not an

appropriate mechanism for [movants] to protect [their] substantive interests." *In re ESA Litigation*, 2010 WL 3386392, at *5. Accordingly, the Court concludes that movants' motions must be denied.

## IV. CONCLUSION

For the foregoing reasons, movants' motions to intervene must be denied. Accordingly, it is this 11th day of April 2011 hereby

**ORDERED** that ATA and NBAA's motion to intervene in support of defendant [#10] is **DENIED**; and is further

**ORDERED** that AIA and GAMA's motion to intervene in support of defendant [#12] is **DENIED**.

Henry H. Kennedy, Jr.
United States District Judge