UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al.,<br><br>    Plaintiffs,<br><br> v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br><br>and<br><br>LISA JACKSON, Administrator of the Environmental Protection Agency,<br><br>    Defendants. | Civil Action 10-00985 (HHK) |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Center for Biological Diversity, Center for Food Safety, Friends of the Earth, International Center for Technology Assessment, and Oceana (collectively, "plaintiffs") bring this action against the U.S. Environmental Protection Agency and its Administrator, Lisa Jackson (together, "EPA"), seeking to compel agency action with regard to the regulation of emissions by nonroad vehicles and engines, including marine vessels and aircraft, under the Clean Air Act ("the Act"), 42 U.S.C. § 7401 *et seq*. Before the Court is EPA's motion to dismiss in part [#9], which argues that three of plaintiffs' four claims fail to state a claim for relief and are beyond the Court's jurisdiction. Upon consideration of the motion, the opposition thereto, and the record of this case, the Court concludes that the motion must be granted in part and denied in part.

## I. BACKGROUND

### A. The Clean Air Act

The Clean Air Act gives EPA the authority to regulate "air pollutants," a category that it defines very broadly. *See* 42 U.S.C. § 7602(g); *Massachusetts v. EPA*, 549 U.S. 497, 506–09 (2007) (describing the history of the Act and efforts to address climate change). Here, plaintiffs' claims relate to two of the Act's air-quality provisions: section 213 and section 231. Section 213 deals with emissions from nonroad engines and vehicles, and provides in part that "[i]f the [EPA] Administrator determines that any emissions . . . from new nonroad engines or vehicles significantly contribute to air pollution which may reasonably be anticipated to endanger public health or welfare, the Administrator may promulgate (and from time to time revise) such regulations as the Administrator deems appropriate . . . ." 42 U.S.C. § 7547(a)(4). Section 231 provides in relevant part that EPA "shall, from time to time, issue proposed emission standards applicable to the emission of any air pollutant from any class or classes of aircraft engines which in [its] judgment causes, or contributes to, air pollution which may reasonably be anticipated to endanger public health or welfare." *Id*. § 7571(a)(2)(A). These determinations that certain emissions cause or contribute to dangerous air pollution are commonly referred to as endangerment findings.

### B. Plaintiffs' Petitions and this Suit

Between October 2007 and January 2008, plaintiffs submitted three petitions to EPA, asking it to use its authority under the provisions described above to regulate greenhouse gas emissions from marine vessels, aircraft, and other nonroad vehicles. Compl. ¶¶ 48–50. EPA subsequently issued an Advance Notice of Proposed Rulemaking regarding greenhouse gas

2

emissions, *see Regulating Greenhouse Gas Emissions Under the Clean Air Act*, 73 Fed. Reg. 44,354 (July 30, 2008), but plaintiffs assert that it was not responsive to their petitions because it neither determined whether greenhouse gas emissions from these sources endanger public health or welfare nor established a plan for regulating such emissions. Compl. ¶¶ 55–59. Accordingly, as required by the Act, *see* 42 U.S.C. § 7604(a), plaintiffs sent letters to EPA announcing their intention to file suit, *see* Def.'s Mem. Ex. A ("Earthjustice Notice Letter"), Ex. B ("WELC Notice Letter"), and then commenced this action.[1]

Plaintiffs' complaint presents four claims under 42 U.S.C. § 7604(a), which allows district courts "to compel . . . agency action unreasonably delayed," each alleging a specific unreasonable delay on the part of EPA: (1) failure to respond to plaintiffs' October 2007, December 2007, and January 2008 petitions, Compl. ¶¶ 70–71; (2) failure to determine whether emissions of greenhouse gases and black carbon from marine vessels cause or contribute to dangerous air pollution, Compl. ¶¶ 72–74; (3) failure to determine whether emissions of greenhouse gases and black carbon from nonroad vehicles and engines cause or contribute to dangerous air pollution, Compl. ¶¶ 75–77; and (4) failure to determine whether emissions of greenhouse gases and black carbon from aircraft engines cause or contribute to dangerous air pollution. Compl. ¶¶ 78–80. EPA now moves to dismiss claims two, three, and four.

---

[1] After plaintiffs filed suit, two aircraft industry groups sought leave to intervene in support of EPA. *See Ctr. for Biological Diversity v. U.S. EPA*, 2011 WL 1346965, at *2 (D.D.C. Apr. 11, 2011). The Court denied their motions, finding that they lacked the standing required for intervention as of right, *id*. at *2–7, and that they had not shown a basis for permissive intervention. *Id*. at *7–8.

## II. LEGAL STANDARDS

### A. Lack of Subject-Matter Jurisdiction

Under Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss a complaint, or a portion thereof, for lack of subject-matter jurisdiction. FED. R. CIV. P. 12(b)(1); *see Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) ("Federal courts are courts of limited jurisdiction. . . . It is to be presumed that a cause lies outside this limited jurisdiction . . . ."). In response to such a motion, the plaintiff must establish that the Court has subject-matter jurisdiction over the claims in the complaint. *See Shuler v. United States*, 531 F.3d 930, 932 (D.C. Cir. 2008). If the plaintiff is unable to do so, the Court must dismiss the action. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (citing *Ex parte McCardle*, 74 U.S. 506, 514 (1868)). When resolving a motion made under Rule 12(b)(1), a court may consider material beyond the allegations in the plaintiff's complaint. *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253–54 (D.C. Cir. 2005).

### B. Failure to State a Claim Upon Which Relief May Be Granted

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), the Court will dismiss a complaint, or a portion thereof, that fails to plead "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Thus, although a complaint need not contain detailed factual allegations, it must recite facts sufficient to at least "raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555. A "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, —U.S.—, 129 S.

Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id*. (quoting *Twombly*, 550 U.S. at 557) (alterations in original). At bottom, a complaint must contain sufficient factual matter that, accepted as true, would allow the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

### III. ANALYSIS

EPA seeks the dismissal of claims two, three, and four (which the Court will call the "determination claims") on two grounds: first, that plaintiffs' notice of intent to sue encompassed only claim one and not the remaining claims; and second, that plaintiffs have not identified an enforceable obligation that EPA has failed to meet. Because EPA's notice argument goes to the Court's jurisdiction, the Court addresses it first. *See Steel Co.*, 523 U.S. at 94–95.

**A.     Notice of Intent to Sue**

The Act's "citizen suit" provision, 42 U.S.C. § 7604, provides that the "district courts of the United States shall have jurisdiction to compel . . . agency action unreasonably delayed." *Id*. § 7604(a). It also provides that, "[i]n any such action for unreasonable delay, notice to the [EPA] shall be provided 180 days before commencing such action." *Id*. Notice-and-delay requirements of this type are "mandatory conditions precedent to commencing suit." *Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 31 (1989) (construing near-identical language in the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6972). When suit is filed against a government agency, these requirements are, as conditions on the government's waiver of sovereign immunity, jurisdictional. *Conservation Force v. Salazar*, 715 F. Supp. 2d 99, 102–03 (D.D.C. 2010); *see*

*Hercules Inc. v. United States*, 516 U.S. 417, 422 (1996) ("[T]he terms of [the government's] consent to be sued in any court define that court's jurisdiction to entertain the suit." (quoting *United States v. Testan*, 424 U.S. 392, 399 (1976)) (internal quotation marks omitted)).

Here, EPA contends that plaintiffs' notices of intent to sue announced only their intention to challenge EPA's failure to respond to their petitions, and not also its failure to reach the endangerment findings sought by those petitions. EPA thus argues that the Court has no jurisdiction over claims two, three, and four, which relate to those findings. Plaintiffs respond that the notices adequately broadcast their intention to file all of the claims in this action. The Court agrees with plaintiffs.

The Act itself does not define or qualify the term "notice." *See* 42 U.S.C. § 7604. EPA's regulations require a notice of intent to sue under the Act to "identify the provisions of the Act which requires [the act or duty alleged, and] . . . describe with reasonable specificity the action taken or not taken by the Administrator which is claimed to constitute a failure to perform such act or duty." 40 C.F.R. § 54.3(a). Here, plaintiffs have done both.

Plaintiffs' notice came in the form of two letters sent to EPA on July 31, 2008. *See* Earthjustice Notice Letter; WELC Notice Letter. The first letter described plaintiffs' October 2007 marine-vessels petition and their December 2007 aircraft petition, noted EPA's failure to act thereon, and stated: "We intend to file suit for an unreasonable delay in responding to both the marine vessels petition and the aircraft petition should EPA not grant or deny our request within 180 days of this notice." Earthjustice Notice Letter at 2. The remaining four pages of the letter discussed EPA's obligations under sections 213 and 231 of the Act to conduct the endangerment determinations requested in the petitions. *See* Earthjustice Notice Letter at 3–6.

Significantly, sections 213 and 231 do not require EPA to respond to petitions — they impose the putative endangerment-finding obligations that plaintiffs' determination claims are intended to enforce. *See* 42 U.S.C. §§ 7547, 7571. A reasonable reader of this letter could not understand plaintiffs to challenge only EPA's failure to make *some* response to their petitions; such a conclusion is inconsistent with the letter's emphasis on EPA's alleged statutory obligations to make endangerment findings and its description of the dangers posed by climate change. *See* Earthjustice Notice Letter at 3–6.

The second letter was even clearer. It first described the January 2008 nonroad-emissions petition, observed that EPA had not acted thereon, and then announced plaintiffs' intent to sue. WELC Notice Letter at 1–2. It then stated:

> Where, as here, the notice of intent is based on EPA's failure to act, *the notice must identify the provisions of the [Act] that require the agency to take action and describe the agency's failure to perform. Section 213 of the [Act] applies to nonroad vehicles and engines*. Section 213(a)(l), directs EPA 'to determine if . . . emissions [from nonroad engines and vehicles] cause, or significantly contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare.'

WELC Notice Letter at 2 (omission and third alteration in original) (emphasis added) (footnote omitted). The letter went on to recite that "EPA's *failure to exercise its statutory authority to sharply cut GHG emissions* is consigning much of our nation and this planet to an inhospitable future. *This inaction* . . . constitutes an enormous violation of the public trust." WELC Notice Letter at 3 (emphasis added). This language plainly identifies section 213 as the provision of the Act responsible for the duty it alleges and makes clear that plaintiffs will challenge EPA's "failure to exercise its statutory authority to sharply cut GHG emissions" — not merely its failure to make some reply to plaintiffs' petitions. Under EPA's own regulations, no more is required.

7

Moreover, the Court agrees with plaintiffs that the purpose of the pre-suit notice requirement has been served here. Notice requirements like this one are intended to preserve an agency's authority to enforce the regulations within its bailiwick (by preventing citizen suits from supplanting agency action) and to allow the agency "an opportunity to bring itself into complete compliance with the Act and thus . . . render unnecessary a citizen suit." *Hallstrom*, 493 U.S. at 29 (quoting *Gwaltney of Smithfield, Inc. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60 (1987)) (internal quotation marks omitted). Here, plaintiffs' notice letters — and the petitions that preceded them — apprised EPA of its putative obligations under the Act and accorded it ample opportunity to take whatever steps it saw as appropriate. Simply put, EPA cannot claim to have been ambushed by plaintiffs' claims in this action.

*Conservation Force v. Salazar*, 715 F. Supp. 2d 99, on which EPA relies, is not to the contrary. *Conservation Force* dealt with a provision of the Endangered Species Act requiring the Secretary of the Interior to make a preliminary finding on petitions submitted thereunder within 90 days, and then to make a more substantial finding within 12 months. *See* 715 F. Supp. 2d at 101. The *Conservation Force* plaintiffs brought suit challenging the Secretary's failure to make the 12-month finding, but their notice letter only mentioned the 90-day step. *Id*. at 103. Finding that the letter made no mention of any other error related to the plaintiffs' petition, the *Conservation Force* court held that the plaintiffs' 12-month-finding claim could not proceed. *Id*. at 104; *see also Common Sense Salmon Recovery v. Evans*, 329 F. Supp. 2d 96, 104 (D.D.C. 2004) (holding that the plaintiffs' notice was deficient because it "made no mention" of one of their claims).

There are two key differences between this case and *Conservation Force*. First, the *Conservation Force* plaintiffs' notice letter "d[id] not mention" any procedural errors other than the failure to make a 90-day finding. *Id.* at 103. Here, as noted, pages of plaintiffs' letters are devoted to EPA's obligation to make endangerment findings pursuant to sections 213 and 231 — under which plaintiffs now bring their claims. Second, because the *Conservation Force* plaintiffs sent their notice letter *before* the Secretary's obligation to make a 12-month finding had been triggered, it was impossible for either party to know at the time that such a finding would be required at all, let alone that the plaintiffs would file suit over its absence. *Id.* at 104. That is not the case here.

In holding that plaintiffs' notice was sufficient for their claims to proceed, the Court does not find fault with EPA's argument that, as a condition on the government's waiver of sovereign immunity, the Act's notice requirement must be construed in the government's favor. *See Lane v. Peña*, 518 U.S. 187, 192 (1996). But the proper construction of the Act is not at issue here. EPA's own regulations require only "reasonable specificity." 40 C.F.R. § 54.3(a). Plaintiffs could have stated their intentions with greater clarity, but their failure to do so does not deprive the Court of jurisdiction where their notice of intent to sue identified their present claims with the requisite specificity.

**B.     EPA's Duty to Make Endangerment Findings**

Having concluded that it has jurisdiction over plaintiffs' determination claims, the Court turns to EPA's argument that those counts fail to state a cognizable claim for unreasonable delay. Because "a delay cannot be unreasonable with respect to action that is not required," *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 n.1 (2004), an unreasonable-delay claim requires that

9

the agency has a duty to act in the first place. *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1280 (D.C. Cir. 2005); *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 418 (D.C. Cir. 2004). Here, EPA contends that the Clean Air Act provisions on which plaintiffs rely — sections 213 and 231 — cannot support plaintiffs' unreasonable-delay claims because they give EPA the discretion to conduct the endangerment findings that plaintiffs seek, but do not require it to do so. Because the two provisions use different language, the Court addresses them separately.

1. **Section 213**

Section 213, which is codified at 42 U.S.C. § 7547, deals with "emissions from nonroad engines and nonroad vehicles." 42 U.S.C. § 7547(a). Paragraph 213(a)(4), at issue here, provides:

> If the Administrator determines that any emissions not referred to in [a prior paragraph] from new nonroad engines or vehicles significantly contribute to air pollution which may reasonably be anticipated to endanger public health or welfare, the Administrator may promulgate (and from time to time revise) such regulations as the Administrator deems appropriate . . . .

42 U.S.C. § 7547(a)(4). EPA sees two loci of discretion in this language: the word "if" in the predicate clause, and the word "may" in the conditional clause. EPA argues that these terms vest it with discretion to determine (or not) whether any nonroad emissions "significantly contribute to air pollution which may reasonably be anticipated to endanger public health or welfare," *id*., and, if so, to regulate (or not). Plaintiffs respond that the statutory language assumes that EPA will undertake the determination in question, with the word "if" denoting what will happen should that determination be affirmative, not should it occur *and* be affirmative. EPA has the stronger position.

10

Plaintiffs' contention that paragraph 213(a)(4)'s language assumes that EPA will conduct endangerment findings is belied by the language of subsection 213(a)'s other provisions. Indeed, paragraph (4) stands out among the five paragraphs as the only one *lacking* a concrete deadline by which EPA must make an endangerment finding or take a related step. Paragraph (1) requires EPA to conduct a study by a certain date; paragraph (2) requires to EPA make an endangerment finding within twelve months of that study's completion; paragraph (3) gives EPA another twelve months to promulgate regulations based on that finding; and paragraph (5) requires promulgation of other regulations by a specific date. *See* 42 U.S.C. § 7547(a)(1)–(3), (5). Unlike its counterparts, paragraph (4) is simply silent as to when — or whether — EPA must make endangerment findings; it merely says what EPA "may" do "if" an affirmative finding is made. The Court cannot assume that this difference is accidental. *See Sosa v. Alvarez–Machain*, 542 U.S. 692, 711 n.9 (2004) (noting the "usual rule" that when one statute uses different terms, courts presume that different meanings are intended).

Plaintiffs acknowledge that paragraph (4) lacks an express action requirement, but contend that without such a requirement, it would be incomplete or incoherent; they argue that allowing EPA to avoid regulating air pollution by refusing to conduct endangerment findings would defeat the purpose of the Act.[2] The problem with this argument is that EPA's interpretation of paragraph (4) — as a catch-all provision, designed to give EPA the flexibility to

---

[2] Plaintiffs also argue that the Supreme Court's decision in *Massachusetts v. EPA*, 549 U.S. 497, establishes EPA's non-discretionary duty to undertake endangerment findings. But *Massachusetts* construed section 202 of the Act, *see id.* at 532–33, which uses language very different from that of section 213. *Compare* 42 U.S.C. § 7521(a)(1), *with id*. § 7547(a)(4). Thus, its interpretation of that provision is not useful in deciphering section 213. Moreover, *Massachusetts*, as explained further below, did not recognize a freestanding duty like that advocated by plaintiffs here. *See infra* subsection III.B.2.

deal with certain emissions if it decides that doing so is necessary — is neither incomplete nor incoherent. It is hardly implausible that Congress, having dealt specifically with "carbon monoxide, oxides of nitrogen, and volatile organic compounds" in paragraph (2), 42 U.S.C. § 7547(a)(2), saw fit to give EPA discretion to deal as needed with other nonroad emissions. Further, because paragraph (4) provides that EPA "may" regulate in the event of an affirmative finding, an initial duty to conduct a finding would have little force; if EPA wished to avoid regulating, it would remain free to do so. And finally, EPA's interpretation of paragraph (4) avoids a non-trivial difficulty raised by plaintiffs': if plaintiffs are correct that paragraph (4) includes a non-discretionary obligation, at what time and under what circumstances is that obligation triggered? Plaintiffs offer no answer to this question, a fact that undercuts their argument that a non-discretionary obligation is present. *See In re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000).

In sum, the Court cannot conclude that paragraph 213(a)(4) was intended to require EPA to conduct endangerment findings. Its language lacks any such obligation, and inferring one would go beyond Congress's express instructions and create practical difficulties. Plaintiffs may be right that, as a policy matter, EPA should always be obligated to conduct endangerment findings, but where Congress intends that outcome, it says so. *See, e.g.*, 42 U.S.C. § 7547(a)(1)–(3). The Court cannot assume that Congress's adoption of different language in paragraph (4) "is attributable to sloppy draftmanship." *Motor & Equip. Mfrs. Ass'n, Inc. v. EPA*, 627 F.2d 1095,

1113 (D.C. Cir. 1979). Accordingly, counts two and three of plaintiffs' complaint must be dismissed for failure to state a claim.[3]

### 2. Section 231

Section 231, which addresses aircraft emissions and is codified at 42 U.S.C. § 7571, provides in part that EPA "shall, from time to time, issue proposed emission standards applicable to the emission of any air pollutant from any class or classes of aircraft engines which in [its] judgment causes, or contributes to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7571(a)(2)(A). Plaintiffs contend that the Supreme Court's decision in *Massachusetts v. EPA*, 549 U.S. 497, which construed almost identical language in section 202 of the Act, establishes that this provision imposes a non-discretionary obligation on EPA to make endangerment findings. EPA counters that the statutory language does not require EPA to act, and that *Massachusetts* did not resolve this question.

First, EPA is correct that *Massachusetts* does not govern here. There, as here, the plaintiffs submitted a rulemaking petition to EPA (in that case, seeking regulation of greenhouse-gas emissions from motor vehicles). *Id.* at 510. But there, unlike here, EPA responded to — and denied — the petition. EPA stated that it lacked the authority to address climate change and that,

---

[3] Contrary to plaintiffs' objections, the dismissal of these claims does not grant EPA unfettered discretion to avoid regulating nonroad and marine emissions. Plaintiffs' nonroad and marine petitions remain pending before EPA, and plaintiffs' claim that EPA has unduly delayed its response to those petitions will remain before this Court. If plaintiffs prevail on that claim, the Court will be empowered to order EPA to act on plaintiffs' petitions. *See* 42 U.S.C. § 7604(a) ("The district courts of the United States shall have jurisdiction to compel . . . agency action unreasonably delayed . . . ."). And if EPA denies those petitions in whole or in part, plaintiffs will have recourse in the U.S. Court of Appeals for the District of Columbia Circuit, *see id.* § 7607(b)(1), which will ensure that EPA's stated reasons for denying the petitions are consistent with the Act's language and structure. *See Massachusetts*, 549 U.S. at 533–34.

even if it had that authority, it would decline to do so for various policy reasons. *Id*. at 511. The Supreme Court found EPA's denial of the petition to be arbitrary and capricious. First, the Court held that EPA did have the authority to issue the requested regulations. *Id.* at 528–32. Second, and more importantly for present purposes, the Court held that EPA erred by declining, for policy reasons, to regulate. Looking to section 202, which (like section 231) states that EPA "shall" regulate "emission[s] . . . which in [its] judgment cause, or contribute to, air pollution," 42 U.S.C. § 7521(a)(1), the Court concluded that EPA could only decline to regulate if it determined that the emissions in question did not cause or contribute to air pollution, or that such a determination could not be made. *Massachusetts*, 549 U.S. at 532–33.

Plaintiffs rely on the *Massachusetts* Court's interpretation of section 202 to argue that section 231's near-identical language requires EPA to conduct endangerment findings. But, as EPA points out, *Massachusetts*'s holding does not reflect a conclusion that section 202 imposes an independent obligation on EPA to conduct endangerment findings. Rather, the Court held that "*once EPA has responded to a petition for rulemaking,* its reasons for action or inaction must conform to the authorizing statute." *Id*. at 533 (emphasis added). Having concluded that EPA's stated reasons did not so conform, the Court explained that it "need not . . . reach the question whether on remand EPA must make an endangerment finding . . . . We hold only that EPA must ground its reasons for action or inaction in the statute." *Id*. at 534–35 (internal citation omitted) (citing *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843–844 (1984)).

This discussion makes clear that the *Massachusetts* Court was addressing EPA's obligations *when responding to a rulemaking petition*; that is, the Court held that where a party has petitioned EPA to conduct a rulemaking under section 202, EPA may not decline to do so for

14

reasons beyond the scope of the Act. The Court did not hold that section 202 itself obligates EPA to conduct that rulemaking or make the predicate endangerment finding. Thus, *Massachusetts* does not establish a duty of the type that plaintiffs propose here.

But that fact does not end the Court's inquiry. The question remains whether section 231 itself creates such a duty. EPA acknowledges that paragraph 231(a)(2)(A)'s use of mandatory language, *see* 42 U.S.C. § 7571(a)(2)(A) ("[EPA] *shall* . . . issue proposed emission standards . . . ." (emphasis added)), creates a post–endangerment finding duty to regulate, but argues that it does not require EPA to conduct the endangerment finding in the first place. Plaintiffs respond that such a construction would defeat the purpose of the Act by allowing EPA to shirk its duty to combat air pollution. The Court agrees with plaintiffs.

EPA reads paragraph 231(a)(2)(A) in a vacuum, but it cannot be understood without reference to the provisions around it. Subsection 231(a) reads:

(1)  Within 90 days after December 31, 1970, the Administrator shall commence a study and investigation of emissions of air pollutants from aircraft in order to determine—

   (A)  the extent to which such emissions affect air quality in air quality control regions throughout the United States, and

   (B)  the technological feasibility of controlling such emissions.

(2)  (A)  The Administrator shall, from time to time, issue proposed emission standards applicable to the emission of any air pollutant from any class or classes of aircraft engines which in his judgment causes, or contributes to, air pollution which may reasonably be anticipated to endanger public health or welfare.

   (B)  (i)  The Administrator shall consult with the Administrator of the Federal Aviation Administration on aircraft engine emission standards.

> (ii) The Administrator shall not change the aircraft engine emission standards if such change would significantly increase noise and adversely affect safety.
>
> (3) The Administrator shall hold public hearings with respect to such proposed standards. . . . Within 90 days after the issuance of such proposed regulations, he shall issue such regulations with such modifications as he deems appropriate. Such regulations may be revised from time to time.

42 U.S.C. § 7571(a). These provisions, all of which use compulsory language, together create a comprehensive scheme for the regulation of harmful aircraft emissions, of which paragraph 231(a)(2)(A) is the centerpiece: no other provision provides for the development of aircraft emissions standards.

This statutory structure belies EPA's assertion that paragraph 231(a)(2)(A) merely serves to provide EPA with discretion to conduct endangerment findings. Congress's use of "shall" throughout subsection 231(a) suggests that it intended to mandate a certain outcome — the regulation of harmful aircraft emissions. *See Allied Pilots Ass'n v. Pension Ben. Guar. Corp.*, 334 F.3d 93, 99 (D.C. Cir. 2003) (noting that "shall" is ordinarily a command). That purpose would be defeated by allowing EPA to avoid triggering its obligation to regulate in the first place. Indeed, EPA offers no explanation why Congress might have mandated the second step in a two-step regulatory process while leaving the first step to the discretion of the agency; after all, if step one is discretionary, the "shall" that appears to require step two becomes largely nugatory. Such an outcome is inconsistent with Congress's use of mandatory language and the stated function of the provisions in question.[4]

---

[4] The Court does not suggest that Congress could never have a reason to create a regulatory structure in which a discretionary first step triggers a mandatory second step; but where, as here, the first step is a factual determination that does not turn on policy questions — do aircraft emissions contribute to harmful air pollution? — the Court sees no basis to infer that

A comparison with paragraph 213(a)(4), discussed above, is instructive: there, the conclusion that EPA could decide whether to take step one was consistent with the fact that EPA had express discretion whether to take step two. *See* 42 U.S.C. § 7547(a)(4) (providing that if EPA makes an affirmative endangerment finding, it "*may* promulgate . . . such regulations as [it] deems appropriate" (emphasis added)). Indeed, the fact that paragraph 231(a)(2)(A) does not employ paragraph 213(a)(4)'s "if, then" structure further suggests that the two provisions are intended to operate differently. *Compare* 42 U.S.C. § 7547(a)(4), *with id.* § 7571(a)(2)(A); *see Sosa*, 542 U.S. at 711 n.9 (different statutory terms imply different meanings). And, whereas paragraph 213(a)(4) could plausibly be read as a catch-all provision because other paragraphs around it created a mandatory regime of regulation, paragraph 231(a)(2)(A) cannot: it is, as noted above, the only provision in section 231 that provides for the development of aircraft emissions standards.

Moreover, the Act's history suggests that paragraph 231(a)(2)(A) was and is intended to create a duty to conduct endangerment findings. When originally enacted in 1970, instead of "The Administrator shall, from time to time, issue proposed emission standards," paragraph 231(a)(2)(A) began with: "*Within 180 days* after commencing [the] study and investigation [required by paragraph (a)(1)], the Administrator shall publish a report of such study and investigation and shall issue proposed emission standards." Clean Air Amendments of 1970, 91

---

Congress intended to allow EPA to avoid the effect of mandatory statutory language merely by declining to make that determination in the first place. The fact that paragraph 231(a)(2)(A) refers to the endangerment finding as a "judgment" does not alter this conclusion. *See Massachusetts*, 549 U.S. at 532–33 ("While the statute does condition the exercise of EPA's authority on its formation of a 'judgment,' that judgment must relate to whether an air pollutant 'cause[s], or contribute[s] to, air pollution which may reasonably be anticipated to endanger public health or welfare.'" (quoting 42 U.S.C. § 7521(a)(1)) (internal citations omitted)).

Pub. L. No. 604, 84 Stat. 1676, 1704 (1970) (emphasis added). The fact that this language required EPA to take two discrete steps by a concrete deadline strongly suggests that the predicate determination was never intended to be a separate, discretionary phase, but rather was part and parcel of the study-and-regulate scheme that EPA was required to follow. That impression is reenforced by the House Report on the 1970 Act. *See* H.R. REP. No. 91-1146 (1970), *reprinted in* 1970 U.S.C.C.A.N. 5356, 5369–70 ("Section 231 *directs the Secretary to prescribe, as soon as practicable* . . . emissions standards for any class of aircraft or aircraft engines which cause or contribute to [harmful] air pollution . . . ." (emphasis added)). There is no indication that the change to the current language, which occurred in 1977, *see* Clean Air Act Amendments of 1977, Pub. L. No. 95–95, 91 Stat. 685, 791 (1977), was intended to do anything more than provide EPA with some flexibility as to *when* it had to regulate.[5]

Finally, the current version of paragraph 231(a)(2)(A) does not, unlike paragraph 213(a)(4), lack any indication of when EPA's obligation to conduct endangerment findings is triggered. It requires EPA to act "from time to time," 42 U.S.C. § 7571(a)(2)(A), a phase that, while vague, allows for judicial review of an agency's allegedly unreasonable delay. *See Am. Lung Ass'n v. Reilly*, 962 F.2d 258, 263 (2d Cir. 1992) ("[W]hen a statute requires agency action at indefinite intervals, such as 'from time to time' . . . 'unreasonable delay' [can] be a meaningful standard for judicial review."). Thus, an unreasonable delay claim brought to enforce paragraph

---

[5] The House Report and House Conference Report to the 1977 amendments do not address the purpose or meaning of this change. *See* H.R. REP. No. 95-294 (1977), *reprinted in* 1977 U.S.C.C.A.N. 1077; H.R. CONF. REP. No. 95-564 (1977), *reprinted in* 1977 U.S.C.C.A.N. 1502.

18

231(a)(2)(A) would not lack any standard against which to judge the reasonableness of the agency's performance.

In sum: EPA's interpretation of paragraph 231(a)(2)(A) does not accord with section 231's structure and purpose. Congress's use of mandatory language, and paragraph 231(a)(2)(A)'s role in the aircraft-emissions-regulation regime created by section 231, strongly suggest that Congress intended the predicate endangerment finding to be a compulsory step. Such a conclusion does not rob EPA of regulatory discretion; on the contrary, the D.C. Circuit has recognized that section 231 "confer[s] broad discretion to the Administrator to weigh various factors in arriving at appropriate standards" for aircraft emissions. *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1230 (D.C. Cir. 2007). But that discretion does not extend to eschewing a required component of the regulatory process. Accordingly, EPA's motion to dismiss must be denied as to claim four.

## IV. CONCLUSION

For the foregoing reasons, EPA's motion to dismiss must be granted in part and denied in part.

Accordingly, it is this 5th day of July 2011 hereby

**ORDERED** that defendant's partial motion to dismiss [#9] is **GRANTED** as to claims two and three of plaintiffs' complaint and **DENIED** as to claim four.

Henry H. Kennedy, Jr.
United States District Judge